## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JAMES STEPPI,                          )
                                   )
    Plaintiff,             )
                                   )
    v.                     )    Civil Action No. 10-954-SLR-SRF
                                   )
CAROLYN W. COLVIN,                     )
Commissioner of Social Security,       )
                                   )
    Defendant.             )

### REPORT AND RECOMMENDATION

### I.     INTRODUCTION

Plaintiff James Steppi ("Plaintiff") appeals from a decision of Carolyn W. Colvin, the Commissioner of the Social Security Administration (the "Commissioner" or "Defendant"),[1] denying his claim for disability insurance benefits under Sections 216(i) and 223(d) of the Social Security Act. This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Presently before the court are cross-motions for summary judgment filed by Plaintiff (D.I. 9) and the Commissioner (D.I. 14). Plaintiff asks the court to enter an award of benefits or, alternatively, to remand this case for further administrative proceedings. (D.I. 10 at 19) The Commissioner requests that the decision of the administrative law judge ("ALJ") be affirmed. (D.I. 15 at 3) For the reasons set forth below, I recommend that the court DENY Plaintiff's motion for summary judgment and GRANT the Commissioner's cross-motion for summary judgment.

---

[1] Carolyn W. Colvin became the Commissioner of Social Security on February 13, 2013, after this proceeding was initially filed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin replaced the previous Commissioner, Michael J. Astrue, as the defendant in this case.

## II.   BACKGROUND

### A.   Procedural History

On June 20, 2007, Plaintiff filed an application for disability insurance benefits alleging that he has been disabled since December 11, 2006. (D.I. 5 at 112-19) Plaintiff's claim for benefits was denied initially on February 3, 2008 (*id.* at 87-91), and on reconsideration on December 11, 2008 (*id.* at 95-98). On January 28, 2009, Plaintiff filed a written request for a hearing. (*Id.* at 104-05)

On November 19, 2009, ALJ Melvin D. Benitz held an administrative hearing, by video, at which Plaintiff and a vocational expert ("VE") appeared and testified. (*Id.* at 35-82) On December 22, 2009, the ALJ issued a decision finding that Plaintiff was not disabled and could perform a limited range of simple, routine, unskilled, medium work. (*Id.* at 16, 24-25) The Appeals Council denied Plaintiff's request for review. (*Id.* at 1-3, 83-84)

### B.   Factual Background

#### 1.   Medical History

Plaintiff has four severe impairments: possible toxic exposure to hydrogen sulfide, degenerative disc disease, anxiety/panic disorder, and somatoform disorder.[2] (*Id.* at 9)

#### a.   Possible Toxic Exposure to Hydrogen Sulfide

Plaintiff last worked as an electrician for Conti Electric at Valero Oil Refinery. (*Id.* at 41, 275, 284, 343) Plaintiff reported that he was working 7 days a week, 12 hours a day. (*Id.* at 398)

On December 11, 2006, while at work, Plaintiff thought he was having a stroke. (*Id.* at 40-44, 265, 274) Plaintiff reportedly felt nauseous, and experienced chest tightness and tingling in his fingers. (*Id.* at 265, 274, 298) He was taken by ambulance to Christiana Hospital. (*Id.*)

---

[2] Plaintiff was diagnosed with asbestosis in 1999 (*see* D.I. 5 at 287), but does not contend that it is a severe impairment.

Paramedics recorded that Plaintiff had a near fainting episode associated with flushing, followed by pallor. (*Id.* at 274) Plaintiff was examined at the hospital and diagnosed with back pain and near syncope (fainting), and he was subsequently discharged. (*Id.* at 252, 255, 274, 298)

Following the incident, Plaintiff claimed that he had been exposed to hazardous chemicals, namely, hydrogen sulfide and benzene.[3] (*Id.* at 52, 284-85, 298, 327, 329, 397) Plaintiff complained of excessive sleepiness, blurry and double vision, poor short-term memory, decreased exercise tolerance, shortness of breath, and anxiety/panic sensation, all of which, he claimed, prevented him from returning to work. (*Id.* at 275, 298)

On January 10, 2007, imaging studies of Plaintiff's brain were normal. (*Id.* at 308)

On January 15, 2007, William Sommers, D.O., examined Plaintiff. (*Id.* at 275) Dr. Sommers noted that Plaintiff expressed concern about potential chemical exposure he suffered while working as an electrician. (*Id.*) Plaintiff reported to Dr. Sommers that he was experiencing symptoms including excessive sleepiness, a feeling that his brain was like "Jello sloshing around in his skull," blurry and double vision, short-term memory loss, anxiety, and panic attacks. (*Id.*) Plaintiff had a follow-up appointment with Dr. Sommers on February 6, 2007. (*Id.* at 274) Dr. Sommers found no organic explanation for Plaintiff's symptoms. (*Id.*)

On May 7, 2007, Orn Eliasson, M.D., examined Plaintiff. (*Id.* at 284) Plaintiff stated to Dr. Eliasson that since the incident on December 11, 2006, he had trouble writing his name and could not add up a check. (*Id.*) Plaintiff further explained that he tried to walk every day but still felt dizzy and had difficulty breathing. (*Id.*) Dr. Eliasson concluded that Plaintiff experienced a textbook case of hydrogen sulfide exposure. (*Id.* at 287) Dr. Eliasson acknowledged that Plaintiff was recovering, but had not recovered completely. (*Id.*)

---

[3] Plaintiff stated that two of his co-workers had been exposed a few weeks earlier to these hazardous chemicals and were suffering from similar symptoms. (*Id.* at 52, 284-85)

Dr. Eliasson examined Plaintiff again on February 20, 2008, and June 24, 2009. (*Id.* at 425-27, 571-74) On both occasions, Dr. Eliasson reiterated his diagnosis of hydrogen sulfide exposure and noted that Plaintiff had significant neurological sequelae, such as short-term memory loss, and lack of equilibrium, which caused him to fall and suffer injury. (*Id.*)

On October 30, 2007, Plaintiff underwent a forensic psychiatric evaluation with Neil Kaye, M.D. (*Id.* at 324-32) Dr. Kaye determined that Plaintiff had not been exposed to hydrogen sulfide. (*Id.* at 332) Dr. Kaye based his conclusion on a number of factors: Plaintiff wore a monitor for toxins and it did not alarm; the individuals standing near Plaintiff during the alleged incident were not affected; Plaintiff's examinations performed shortly after the incident, at Christiana Hospital and by Dr. Sommers, revealed no organic explanation for Plaintiff's symptoms. (*Id.*)

On January 22, 2008, Yong Kim, M.D., performed a consultative examination. (*Id.* at 382-87) Plaintiff complained of fatigue, shortness of breath, balance problems, intermittent involuntary facial movements, arrhythmia, and sleep problems. (*Id.* at 382) Plaintiff's grip strength on the right measured 34 kg, below the normal range of 40 kg. (*Id.* at 383) His Romberg test was mildly to moderately positive. (*Id.*) Plaintiff's cervical, thoracic, and lumbar spine examinations were within normal limits. (*Id.* at 383-87) Dr. Kim diagnosed Plaintiff with a history of possible toxic exposure with symptoms of fatigue and balance problems. (*Id.* at 383)

On January 31, 2008, Margit Bleecker, M.D., Ph.D., examined Plaintiff. (*Id.* at 397-403) Plaintiff's examination was within normal limits, aside from an odor test, which revealed diminished smell ability and residuals of bilateral carpal tunnel syndrome. (*Id.* at 401) Dr. Bleecker noted that chronic exposure to hydrogen sulfide was associated with fatigue, headache, irritability, poor memory, dizziness, disturbed equilibrium, and loss of appetite. (*Id.*) She further

4

stated that cardiac arrhythmias and hemodynamic instability can occur with hydrogen sulfide exposure, which could explain Plaintiff's acute episode since no other etiology was found during his medical evaluation. (*Id.*)

### b.    Degenerative Disc Disease

During Plaintiff's May 7, 2007 examination, Dr. Eliasson noted the presence of osteoarthritis in Plaintiff's past medical history. (*Id.* at 6) Although Plaintiff complained that he was not as flexible as he had been in the past, his musculoskeletal examination was within normal limits. (*Id.*) Dr. Eliasson saw Plaintiff again on June 24, 2009, and noted that Plaintiff's musculoskeletal examination was normal. (*Id.* at 573)

An imaging study of Plaintiff's cervical spinal cord was performed on September 7, 2007. (*Id.* at 310-11) The study revealed a small central disc herniation at C4-C5 without cord compression, multiple neural foraminal narrowing related to facet enlargement and uncovertebral spurs, and a broad disc bulge at C5-C6 and to a lesser extent at C6-C7 without focal disc herniation or cord compression. (*Id.*)

Carlos Reyes, M.D., examined Plaintiff on September 19, 2007. (*Id.* at 338) Plaintiff denied any cervical pain or radicular symptoms, despite experiencing back problems previously. (*Id.*) Dr. Reyes planned to refer Plaintiff to Bikash Bose, M.D., for evaluation of Plaintiff's herniated disk and neuroforaminal stenosis. (*Id.*) Plaintiff saw Dr. Reyes again on October 26, 2007, after falling, twisting his neck and hitting his head. (*Id.* at 337) Plaintiff did not want any pain medication. (*Id.*) Dr. Reyes planned additional imaging studies. (*Id.*) Plaintiff followed up with Dr. Reyes on November 2, 2007 and reported that he was feeling better. (*Id.* at 336) Dr. Reyes noted that Plaintiff's neck CT showed no significant abnormalities. (*Id.*)

5

An imaging study performed on September 24, 2009 revealed extruded disc herniation and osteophyte occupying the right lateral recess at L3-L4 and broad based disc protrusion and osteophyte at L4-L5 indenting on dural sac. (*Id.* at 579-80)

On September 25, 2009, an MRI was performed on Plaintiff's cervical and thoracic spine. (*Id.* at 576-68) The MRI of Plaintiff's cervical spine demonstrated multilevel moderate cervical spondylotic changes with degenerative disc disease. (*Id.* at 577-78) Focal disc protrusions were seen at C4-C5 and a broad based disc osteophyte protrusion was noted at C5-C6 and C6-C7 with mild canal stenosis and bilateral foraminal narrowing. (*Id.*) Mild cord abutment was seen at C5-C6 and C6-C7. (*Id.*) The MRI of Plaintiff's thoracic spine revealed mild spondylotic changes with degenerative disc disease. (*Id.* at 576) A small focal posterior central disc protrusion was noted at T7-T8 level with a broad based disc protrusion at T8-T9 and disc osteophyte extended toward the left neuroforamen at T9-T10 level with left neuroforaminal stenosis. (*Id.*)

Plaintiff followed up with Dr. Reyes on October 15, 2009. (*Id.* at 795) Plaintiff complained of mild back pain. (*Id.*) Dr. Reyes noted his intention to refer Plaintiff to Dr. Bose for further treatment. (*Id.*)

### c.    **Somatoform Disorder**

On June 27, 2007, Marilyn Howarth, M.D., an Occupational Medicine Specialist, examined Plaintiff. (*Id.* at 298) Plaintiff described the December 11, 2006 incident involving alleged toxic substance exposure. (*Id.*) All of Plaintiff's testing to date was negative, aside from an exercise stress test that Plaintiff was unable to complete. (*Id.*) Dr. Howarth observed that Plaintiff was agitated with pressured speech, but had no apparent thinking difficulty and responded to questions rapidly. (*Id.*) Dr. Howarth noted that the lack of initial irritative features combined with no real loss of consciousness suggested modest exposure at best, and follow-up

6

testing revealed no objective findings. (*Id.*) Dr. Howarth concluded that Plaintiff's current symptoms were consistent with adjustment reaction, and she recommended a psychiatric evaluation. (*Id.*)

Samuel Romirowsky, Ph.D., a licensed psychologist, evaluated Plaintiff on August 20, 2007 and September 6, 2007. (*Id.* at 313-17) Dr. Romirowsky noted that Plaintiff's speech was rapid, pressured, digressive and tangential. (*Id.* at 314) Plaintiff had difficulty staying focused. (*Id.*) Dr. Romirowsky observed that Plaintiff had memory problems and was easily frustrated by his inability to recall details of his history. (*Id.*) Plaintiff complained that after his work-related incident he was suddenly overcome with excessive fatigue, dizziness, pain in the back of his head, loss of equilibrium and panic attacks. (*Id.*)

Dr. Romirowsky performed a number of psychological tests on Plaintiff. (*Id.* at 315) Dr. Romirowsky noted Plaintiff's Personality Assessment Inventory test took twice as long to complete than average. (*Id.* at 317) Plaintiff appeared crippled with indecision and exhibited an excessive need to weigh alternatives before selecting an answer. (*Id.*) Plaintiff also expressed a degree of concern about his physical functioning and health matters. (*Id.*) Plaintiff described his thought process as marked by confusion, distractibility, and poor concentration. (*Id.*) Dr. Romirowsky recommended a diagnosis of conversion disorder, assuming there was no further evidence to support a medical basis for Plaintiff's symptoms. (*Id.*) Dr. Romirowsky also stated that Plaintiff had adjustment disorder with mixed emotional features and obsessive, compulsive personality traits. (*Id.*)

On November 26, 2007, Richard Ivins, Ph.D., a licensed psychologist, performed psychological testing on Plaintiff. (*Id.* at 318-23) Plaintiff indicated that his symptoms were severe for five to six months following the work-related incident, and he continued to experience

7

dizziness and extreme vertigo. (*Id.* at 319) Plaintiff performed an exercise stress test, but was unable to complete it because he could not tolerate the treadmill. (*Id.*) Plaintiff's blood pressure was elevated following the test. (*Id.*) Plaintiff reported that he has not had a good day since the incident. (*Id.*) He described his difficulty with attention, concentration, short-term memory and following conversations with people. (*Id.*) Initially, he had difficulty driving and would get lost, but that problem had improved. (*Id.*) Plaintiff expressed that he was mad, upset, and somewhat depressed. (*Id.*) Plaintiff confirmed that he was not taking any medication nor undergoing psychiatric treatment. (*Id.*)

Dr. Ivins administered comprehensive neuropsychological testing on Plaintiff. (*Id.* at 320-23) Plaintiff tested in the average range of general intelligence on the Wechsler Adult Intelligence Scale. (*Id.* at 320) Dr. Ivins noted that on tests where time, speed, and concentration were factors, Plaintiff had difficulty and on several occasions could not finish that item on the test. (*Id.*) Plaintiff's arithmetic reasoning scores were the highest one could earn. (*Id.*) His Wide Range Achievement Test-4 scores were consistent with his level of academic achievement (i.e., high school diploma). (*Id.*) A Memory Assessment Scales test yielded a score of 104, indicating that Plaintiff was in the average range of overall memory functioning when compared to other individuals of his age and education level. (*Id.* at 321) Plaintiff's overall memory function was not significantly lower than his other cognitive functions. (*Id.*) The Verbal Summary Scale test reflected that Plaintiff's ability to learn and retain orally transmitted information was in the low average range. (*Id.*) Plaintiff's Visual Summary Scale results were in the high average range, which indicated that he was able to learn and retain visual-spatial information. (*Id.*)

Dr. Ivins concluded that Plaintiff's overall memory scores were in the average range with mild difficulties in retaining visual material and borderline impairment in retaining new

information presented in oral and written form. (*Id.*) Results of the Symptom Check List-90-R test revealed that Plaintiff's symptomatic distress levels were in the clinical range. (*Id.* at 322) His somatization levels were high and in the clinical range. (*Id.*) He had extremely high obsessive compulsive symptoms. (*Id.*) Plaintiff's depression levels were in the clinical range and were consistent with a true depressive disorder. (*Id.*) He manifested extremely high levels of paranoid ideation. (*Id.*) Dr. Ivins concluded that there was not sufficient test evidence to diagnose a cognitive impairment secondary to toxic exposure. (*Id.* at 323) Dr. Ivins found significant evidence that Plaintiff was having a severe psychological reaction to the incident and had avoided any suggestion that he should avail himself of psychological treatment. (*Id.*)

On January 31, 2008, Daniel Malone, Ph.D., J.D., performed a neurological examination on Plaintiff. (*Id.* at 404-09) Plaintiff's performance on visual, motor and perceptual testing was above average for his age. (*Id.* at 404) Plaintiff's concentration, learning and memory testing measured in the average range, which was consistent with the testing performed by Dr. Ivins. (*Id.*) Plaintiff exhibited an ability to remember information more accurately thirty minutes after it was presented than immediately after it was presented. (*Id.*) Dr. Malone concluded that this was evidence that Plaintiff was not experiencing any abnormal rate of forgetting, which was characteristic of memory impairment associated with neurological disease. (*Id.*) Dr. Malone diagnosed Plaintiff with undifferentiated somatoform disorder. (*Id.*)

### d. Anxiety Reaction/Panic Attack

On October 30, 2007, Plaintiff underwent a forensic psychiatric evaluation with Neil Kaye, M.D. (*Id.* at 324-33) Plaintiff indicated that he was finally able to pass a stress test in July 2007. (*Id.* at 329) Plaintiff reported continuing fatigue but rated it at a medium level, "not excessive." (*Id.*) Plaintiff stated that he had "a bounce in his step" and his heart was back to

9

where it was prior to the incident. (*Id.*) Plaintiff stated, "I'm progressing. . . . If it keeps progressing, in another 6 months, I think I'll be there." (*Id.*) However, Plaintiff noted that his energy level was still not good, his mind was not crisp, his balance was off a bit and he experienced "very[,] very slight vertigo." (*Id.*) He also reported short-term memory problems and indicated that he had gone from a "memory bank computer" to "instant Alzheimer's." (*Id.*)

Dr. Kaye observed that Plaintiff's mood was euthymic and his affect was congruent and appropriate. (*Id.* at 331) His attention and concentration were intact and his memory was also intact for immediate, recent, and remote events. (*Id.*) Plaintiff performed serial sevens rapidly but told Dr. Kaye he was slow. (*Id.*) He was able to spell the word "world" forward and backward. (*Id.*) Dr. Kaye noted that Plaintiff had been working long hours and was tired when the incident occurred. (*Id.* at 332) Plaintiff's presentation and symptoms were classic for an anxiety reaction/panic attack. (*Id.*) He had a very rigid, obsessive personality with narcissistic and paranoid features. (*Id.*) He was over controlling. (*Id.*) Plaintiff's anxiety and stress manifested through physical symptoms spanning many different organ systems, which pointed to a psychiatric explanation, as very few medical conditions cross organ systems. (*Id.*) Dr. Kaye noted that the somatic presentation was to be expected in a man who would have difficulty admitting any weaknesses. (*Id.*) Dr. Kaye diagnosed Plaintiff with adjustment disorder and personality disorder with obsessive and narcissistic features. (*Id.*)

### 2. Non-Medical Evidence

Gertrude Steppi ("Ms. Steppi"), Plaintiff's mother, completed a Third Party Function Report on November 3, 2008. (*Id.* at 193-200) Ms. Steppi noted that Plaintiff was able to take care of his own personal care needs, but he needed to be reminded about personal grooming. (*Id.* at 193-95) He could prepare simple meals, clean, do the laundry, take care of the dishes and do

10

light chores. (*Id.* at 194-96) He shopped for newspapers, groceries, and personal items once or twice a week. (*Id.*) Ms. Steppi also indicated that Plaintiff could pay bills, handle a savings account, and use a checkbook. (*Id.* at 196-98) She noted, however, that Plaintiff needed to be reminded to go places and had to repeat to himself several times written and spoken instructions. (*Id.* at 198)

Ms. Steppi also indicated that Plaintiff spent time with his grandchildren and family and attended dinner at his mother's home five or more times per week. (*Id.* at 197) Otherwise, Plaintiff's social activities were limited. (*Id.*)

### 3. The Administrative Hearing

Plaintiff's administrative hearing took place on November 19, 2009, by video. (*Id.* at 35-82) Plaintiff and a vocational expert testified. (*Id.*) Plaintiff was represented by counsel. (*Id.*)

#### a. Plaintiff's Testimony

Plaintiff was sixty-two years old at the time of the hearing. (*Id.* at 39) He testified that he is divorced and lives by himself in a trailer. (*Id.* at 38) Plaintiff finished high school and went through six years of trade school. (*Id.*) He worked as an electrician for roughly forty-two years. (*Id.* at 39)

Plaintiff receives retirement benefits in excess of $5,000 per month, from four sources: Social Security, his local union, the "International," and the "NEBF." (*Id.* at 40) He also filed an action for workers' compensation benefits in connection with the December 11, 2006 work-related incident, which was pending appeal at the Supreme Court of Delaware.[4] (*Id.*)

Plaintiff testified that he has not worked since the December 11, 2006 incident. (*Id.* at 43) He continues to suffer from a number of symptoms. (*Id.*) He drops and spills things. (*Id.*)

---

[4] Plaintiff ultimately prevailed in his workers' compensation action and was awarded total disability benefits. *See Steppi v. Conti Elec., Inc.*, 2010 WL 718012, at *1 (Del. Mar. 16, 2010).

11

Plaintiff experiences fatigue and sleeps throughout the day. (*Id.* at 45-46) He experiences heart fluttering. (*Id.* at 46)

Plaintiff testified that he had ADD as a child, and it "exploded" after the incident. (*Id.* at 49) He suffers from poor memory and confusion. (*Id.* at 45) For example, Plaintiff becomes confused while doing things around the house, and while doing crossword puzzles and Sudoku. (*Id.* at 50) Plaintiff testified that he got lost driving to his nephew's house, which is one mile away from Plaintiff's home. (*Id.* at 51) Plaintiff stated, however, that his memory and driving are improving. (*Id.* at 50, 51) Plaintiff also claimed that he does not sweat, which increases his body heat and blood pressure, causing him to feel woozy and confused. (*Id.* at 51)

Plaintiff further testified that he fell from a ledge while installing windows in his trailer and suffered injuries to his head, neck, and left shoulder. (*Id.* at 57) Plaintiff attributed the fall to his poor balance. (*Id.*) Plaintiff testified that his back is "pretty well beat up." (*Id.* at 47) He has degenerative disc disease and herniated discs at all three levels. (*Id.*) He experiences back pain and it travels down his right side. (*Id.* at 48)

Plaintiff explained that although his symptoms are still present, they have been "progressively improving." (*Id.* at 46) He stated that on a good day he can rake leaves and help cut the lawn. (*Id.* at 55) He cuts the grass in his mother's front yard on one day and in her back yard the following day. (*Id.*) Plaintiff also assists his mother with groceries, cooking, taking out garbage, and other regular household chores. (*Id.*) He is able to lift up to forty pounds. (*Id.* at 60) Plaintiff can stand for three to four hours on a good day, but on a bad day he can stand for only forty-five minutes due to dizziness. (*Id.* at 56-57) He experiences lumbar pain, which affects his ability to sit. (*Id.* at 58) Plaintiff has difficulty walking. (*Id.*) He used a cane for the first ten months after the incident. (*Id.* at 59)

Plaintiff stated that he is under no restrictions from any doctor and he is not taking any medications. (*Id.* at 60, 67) In fact, Plaintiff's doctors encourage him to try more things. (*Id.* at 61) Plaintiff has not been hospitalized since the work-related incident on December 11, 2006. (*Id.* at 68) Plaintiff testified that he would not be able to return to work due to his fatigue, confusion, and mental status. (*Id.* at 53-54)

### b.    Vocational Expert's Testimony

The ALJ posed the following hypothetical to VE Arthur M. Brown:

> Like for you to assume the fact that the person is 59 years of age on his onset. Has a twelfth grade education, vocational training in the electrical field, plus his work just indicated. Suffering from degenerative disc disease. He has status post [inaudible] possible caustic [sic] exposure and/or anxiety reaction and/or panic, or being hit by something in his work. There are different theories here. Causes him to have mild to moderate pain and weakness, some fatigue. He takes no medication for any of these problems. At the time he had a simple unskilled job, SVP 3, 4, 5. I find he can lift 25 pounds frequently, 50 on occasion. Stand for six hours, sit for two hours. Avoid heights due to his imbalance per his testimony. With limitation be able to do medium work. Do you have any jobs such a person could do with those limitations?

(*Id.* at 72) The VE testified that the individual described would be able to work in occupations including general laborer, cleaner, and helper, all of which have opportunities available in the local and national economies. (*Id.* at 73) The VE further explained that the only available medium work that is transferrable from Plaintiff's past relevant work is an electrician's helper. (*Id.*)

The ALJ changed the hypothetical to describe an individual who could not do medium work, could only lift ten pounds regularly, and twenty pounds on occasion. (*Id.* at 75) The ALJ asked whether there is any work available that is transferrable from Plaintiff's past relevant work. (*Id.*) The VE found no suitable work because Plaintiff's skills are that of an electrician and would not transfer outside the industry. (*Id.*)

### 4. The ALJ's Findings

The ALJ determined based on all of the evidence that Plaintiff has not been under a disability within the meaning of the Social Security Act from December 11, 2006 through the date of his decision. (*Id.* at 7, 25) The ALJ found, in relevant part:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity since December 11, 2006, the alleged onset date.

3. The claimant has the following severe impairments: possible toxic exposure to hydrogen sulfide, degenerative disc disease, anxiety/panic disorder and somatoform disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. [T]he claimant has the residual functional capacity to perform simple routine, unskilled medium work as defined in 20 C.F.R. 404.1567(c) except that he could lift 50 pounds occasionally, 25 pounds frequently, stand or walk for 6, sit for 2 hours for a total of 8 hours in an 8 hour day, and avoiding heights.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on January 4, 1947 and was 59 years old, which is defined as an individual of advanced age, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching retirement age.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

(*Id.* at 7-24)

## III.   STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the Supreme Court has explained, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Id.* at 250-51 (internal

citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act provides insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." 42 U.S.C. § 423(a)(l)(D); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(l)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003). In order to qualify for disability insurance benefits, a claimant must establish that he was disabled prior to the date he was last insured. 20 C.F.R. § 404.131; *Matullo*, 926 F.2d at 244.

To determine whether a claimant is disabled under the Act, the Commissioner is required to perform a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating a finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating a finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an

impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating that a claimant is not disabled if he is able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to his past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating a finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

### B. Plaintiff's Arguments on Appeal

#### 1. ALJ's Consideration of Evidence Concerning Plaintiff's Somatoform Disorder

Plaintiff contends that the ALJ "rejected all of the psychological medical opinion evidence" concerning Plaintiff's somatoform disorder and, therefore, the ALJ's RFC assessment is improperly "based on [his] own lay opinion." [5] (D.I. 10 at 6) According to Plaintiff, the ALJ "implicitly rejected" the medical opinions of Dr. Kaye, to which the ALJ assigned great weight, because the ALJ found that Plaintiff's somatoform disorder was severe, while Dr. Kaye found that Plaintiff "had no serious mental impairment and no work related limitations." (*Id.* at 8) Therefore, Plaintiff maintains that the ALJ's RFC determination "is based upon his own lay judgment barren of any medical support warranting a [sic] reversal of his decision." (*Id.*)

Plaintiff's argument is flawed. Contrary to Plaintiff's assertion, the ALJ's RFC assessment is consistent with Dr. Kaye's opinion. Dr. Kaye opined that "there is no evidence for any serious mental, emotional, neuropsychiatric or neurocognitive condition *that would in any way impair [Plaintiff's] ability to be gainfully employed.*" (D.I. 5 at 332 (emphasis added)) Clearly, Dr. Kaye's opinion addresses Plaintiff's ability to work; not whether Plaintiff suffers from any serious mental impairment. Indeed, the next section of Dr. Kaye's report, titled

---

[5] Specifically, Plaintiff argues that the ALJ

> rejected "all" [sic] the opinions of [Plaintiff's] treating sources. Likewise, [the ALJ] rejected the state agency psychological opinion. Instead, [the ALJ] accepted the opinion of the one time WC IME examiner, Dr. Kaye. However, Dr. Kaye found that [Plaintiff] had no serious mental impairment and no work related limitations. . . . [S]ince [the ALJ] found [Plaintiff's] somatoform disorder severe, he implicitly rejected [Dr. Kaye's] opinion as well. Therefore, because [the ALJ] effectively rejected Dr. Kaye's opinion he actually rejected all of the psychological medical opinion evidence in the record. As a result, [the ALJ's] RFC finding is based upon his own lay judgment barren of any medical support warranting a [sic] reversal of his decision.

(D.I. 10 at 7-8)

"Diagnostic Impression," lists several mental disorders, including "Somatoform Disorder, NOS." (*Id.*) Thus, the ALJ did not reject Dr. Kaye's opinion, and Plaintiff's argument is without merit.[6]

In addition to Dr. Kaye's opinion, the ALJ's determination is based on Plaintiff's description of his daily activities, Ms. Steppi's Third Party Function Report, and Dr. Malone's report finding that Plaintiff's general memory index was in the average range. (*See id.* at 19, 20) In sum, the ALJ's determination that Plaintiff's mental impairments still allow him to perform a range of simple, routine, unskilled medium work, is well supported.

### 2. Limitations Included in RFC Assessment Relative to Plaintiff's Severe Impairments

Plaintiff contends the ALJ's RFC assessment is erroneous because it does not include "established limitations" that result from Plaintiff's severe impairments. (D.I. 10 at 12; D.I. 16 at 3) As discussed below, however, Plaintiff's arguments fail because the ALJ's RFC assessment accounts for all of Plaintiff's limitations that were credibly established by the evidence of record.

#### a. Limitations Relating to Plaintiff's Back Impairment

According to Plaintiff, the ALJ erred by "fail[ing] to include any limitations concerning [Plaintiff's] ability to stoop or bend" because the ALJ "found [Plaintiff's] back impairment severe." (D.I. 10 at 12)

Plaintiff's contention is not persuasive, and this court has rejected virtually identical arguments in previous cases. For example, in *Kelly v. Colvin*, 2013 WL 5273814 (D. Del. Sept. 18, 2013), the plaintiff argued

---

[6] Plaintiff's argument also fails to the extent it suggests that the ALJ, in considering medical evidence, must either accept or reject in its entirety the opinion of a medical source. In contrast, the ALJ is necessarily permitted to credit only portions of evidence (where appropriate) by virtue of the fact that the he must weigh evidence in reaching a decision. *See generally* 20 C.F.R. 404.1527; *see also Scandone v. Astrue*, 2011 WL 3652476, at *11 (E.D. Pa. Aug. 18, 2011).

that the ALJ correctly identified [his] degenerative disc disease as a severe impairment, but failed to include restrictions associated with his degenerative disc disease in [the] RFC assessment . . . . According to [the plaintiff], a finding that an impairment is severe necessarily leads to an inclusion of limitations concerning the impairment in the RFC assessment.

*Id.* at *11. The court disagreed and explained, "'[i]n determining a claimant's RFC, the ALJ is only required to include limitations credibly established by the evidence, not every limitation alleged.'" *Id.* (alteration in original) (quoting *Scandone v. Astrue*, 2011 WL 3652476, at *11-12 (E.D. Pa. 2011)).[7] Consequently, the court held that "a finding of a severe impairment does not automatically lead to the inclusion of limitations resulting from the severe impairment in the RFC assessment."[8] *Id.*

In the present case, the ALJ's RFC assessment includes only the limitations that are credibly established by the evidence of record. With respect to Plaintiff's back impairment, the ALJ determined that Plaintiff is able to perform physical functional activities at "a medium exertional level while avoiding exposure to hazards,"[9] "based upon [Plaintiff's] reported functional abilities, . . . the absence of any objective evidence[10] or ongoing treatment with specialists supporting a reduced level of functioning, and the absence of treatment with pain

---

[7] In *Scandone*, the court held that a claimant's severe impairment does not necessarily entitle her to an RFC assessment accounting for that impairment if the ALJ concludes that no functional limitations stem from that impairment. *Scandone*, 2011 WL 3652476, at *12.

[8] The court in *Kelly* ultimately remanded the case for further proceedings, in part, "because the ALJ did not adequately explain why she discredited limitations that were medically supported but were contradicted by other evidence in the record." *Kelly*, 2013 WL 5273814, at *11.

[9] The ALJ's RFC assessment includes the following limitations: "lift 50 pounds occasionally, 25 pounds frequently, stand or walk for 6, sit for 2 hours for a total of 8 hours in an 8 hour day, and avoid[] heights." (D.I. 5 at 16)

[10] The ALJ also noted that "[n]o physician has mentioned any findings equivalent in severity to any listed [musculoskeletal] impairment, nor are such findings indicated or suggested by the evidence of record." (D.I. 5 at 15)

relievers of any kind." (D.I. 5 at 18) The ALJ's findings are adequately supported by the evidence and, consequently, Plaintiff's argument fails.

### b. Environmental Limitations

Similarly without merit is Plaintiff's assertion that the ALJ "limited [Plaintiff's] exposure to all other 'environmental limitations' but never included these 'environmental limitations' in his RFC finding." (D.I. 10 at 12) Environmental limitations include: extreme heat, extreme cold, wetness, humidity, noise, vibration, fumes (including odors, dusts, gases, and poor ventilation), and hazards (including machinery, and heights). (D.I. 5 at 393) There is no evidence which suggests that the ALJ sought to limit Plaintiff's exposure to all of these environmental factors.

Plaintiff's contention is apparently based on an erroneous interpretation of the statement in the ALJ's decision that "[e]nvironmental limitations were assigned to consider [Plaintiff's] severe impairments and pain." (*Id.* at 19) Reading this statement in the context of the entire decision, it is clear that the ALJ was referring to "hazards" (*see id.* at 16, 19), one type of environmental limitation, which encompasses machinery and heights. (*Id.* at 393) Indeed, the ALJ's RFC analysis specifically limits Plaintiff's exposure to "heights" and "hazards." (*See id.* at 16, 18) Moreover, the ALJ identified these limitations in his questions to the vocational expert at Plaintiff's administrative hearing. (*See id.* at 72, 75 (stating that Plaintiff "[w]ould have to avoid heights and hazardous machinery")) Plaintiff fails to cite any evidence that supports a different conclusion. Consequently, Plaintiff's argument is without merit.

### c. Mental Limitations Relating to Plaintiff's Moderate Difficulties in Social Functioning, and Concentration, Persistence or Pace

Plaintiff further contends that the ALJ failed to account for mental limitations relating to Plaintiff's moderate difficulties in social functioning, and concentration, persistence or pace, in

22

determining that he has the capacity to perform simple, routine, unskilled work. (D.I. 10 at 11-12; D.I. 16 at 2-4)

Plaintiff's argument is not persuasive, and the record contradicts his position. At step three of the sequential evaluation process, the ALJ considered the "B" criteria of Listings 12.06 and 12.07 and found that Plaintiff has moderate difficulties in the areas of social functioning and concentration, persistence or pace. (D.I. 5 at 16) The ALJ specifically noted, however, that "*[t]he limitations identified . . . are not a residual functional capacity assessment* but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process." (*Id.* (emphasis added)) The ALJ subsequently made an RFC determination that accounts for Plaintiff's limitations as demonstrated by the medical evidence.

The ALJ considered whether there is an underlying medically determinable mental impairment. (*Id.* at 9-16) He evaluated the intensity, persistence and limiting effects of the symptoms to assess the extent to which Plaintiff's ability to do basic work activities may be limited. (*Id.* at 15-20) A careful review of the record as whole resulted in a finding that there was a lack of sufficient objective medical evidence to substantiate the severity of pain and degree of functional limitations. (*Id.* at 23) The ALJ properly concluded that subjective complaints may be discounted if there are other inconsistencies in the record as a whole. (*Id.* at 20)

The record in this case presents such inconsistencies, which in turn supports the ALJ's consideration of Plaintiff's subjective complaints. For example, Plaintiff admits in his supporting briefing: (1) "Dr. Sommers reported Mr. Steppi's constellation of symptoms were of uncertain organic etiology" (D.I. 11 at 3); (2) "Dr. Romirowsky acknowledged in his records that Mr. Steppi had no diagnostic tests to support his symptoms" (*id.* at 4); (3) "Dr. Ivins' diagnostic impression was that there was not sufficient evidence to diagnose a cognitive impairment

secondary to toxic exposure but [Plaintiff] was having a severe psychological reaction to the events of December 11, 2006" (*id.* at 5); (4) "[Dr. Kaye] reported that there was insufficient evidence to diagnose a cognitive impairment secondary to toxic exposure" (*id.*); and (5) "Drs. Malone and Bleecker found no cognitive deficits but an undifferentiated 'somatoform' disorder with multiple 'somatic' complaints with no organic basis" (*id.* at 5-6). Consequently, the conclusions of Plaintiff's treating sources that he is unable to work are based solely on subjective complaints, which the ALJ was free to disregard as inconsistent when compared to the medical record as a whole.

The ALJ found that, based on the medical record as a whole, Plaintiff's moderate difficulties in social functioning do not limit his capacity to perform simple, routine, unskilled medium work. The ALJ appropriately noted that Plaintiff's "statements concerning the . . . limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the [RFC]." (*Id.* at 20) Indeed, Dr. Kaye opined that "there is no evidence for any serious mental[] . . . condition that would in any way impair [Plaintiff's] ability to be gainfully employed." (*Id.* at 332)

Furthermore, the ALJ's RFC assessment implicitly accounts for any limitations resulting from Plaintiff's moderate difficulties in concentration, persistence or pace. The Third Circuit has explained that when the ALJ limits a claimant's employment to simple or routine work, it accounts for the claimant's moderate limitations in concentration, persistence, and pace. *See Menkes v. Astrue*, 262 F. App'x 410, 412 (3d Cir.) (holding that the ALJ accounted for the claimant's "moderate limitations in concentration, persistence and pace" by restricting the type

of work to "simple routine tasks"),[11] *cert. denied*, 555 U.S. 1055 (2008). *See also McDonald v. Astrue*, 293 F. App'x 941, 946 (3d Cir. 2008) (same). Here, the ALJ's RFC assessment limits Plaintiff to simple, routine work, which sufficiently accounts for limitations resulting from Plaintiff's moderate difficulties in concentration, persistence or pace.

### 3. The ALJ's Consideration of the Medical Opinions of Drs. Reyes, Romirowsky, Bleecker, and Eliasson

Plaintiff alleges that the ALJ failed to give "appropriate deference" to the medical opinions of Plaintiff's treating sources. (D.I. 10 at 13) As discussed below, however, Plaintiff's argument fails because the ALJ properly considered the medical opinions of the doctors in issue. Moreover, some of these doctors are not treating sources as defined by the regulations.

In determining the appropriate weight medical evidence deserves, the ALJ must first assess whether the evidence is from a treating, non-treating, or non-examining source. A treating source is a "physician, psychologist, or other acceptable medical source" who provides a patient with "medical treatment or evaluation," and has an "ongoing treatment relationship" with the patient. 20 C.F.R. §§ 404.1502, 416.902. A medical source may be considered a treating source where the claimant sees the source "with a frequency consistent with accepted medical practice for the type of treatment . . . required for [the claimant's] condition(s)." *Id.* A medical source is not a treating source if the treatment is based "solely on [the claimant's] need to obtain a report in support of [his or her] claim for disability," and not based on medical need for treatment. *Id.*

A treating source's medical opinion will be given "controlling weight" if the ALJ finds: (1) the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) the opinion is not inconsistent with the other substantial evidence in the

---

[11] "The term 'simple routine tasks,' in the context of the disability proceedings, generally refers to the non-exertional or mental aspects of work. For example, performing a 'simple routine task' typically involves low stress level work that does not require maintaining sustained concentration." *Menkes*, 262 F. App'x at 412.

25

record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Fargnoli*, 247 F.3d at 43; *Conn v. Astrue*, 852 F. Supp. 2d 517, 525 (D. Del. 2012).

In order to determine what weight to accord a non-controlling treating source's opinion, the ALJ is required to weigh the evidence in light of several factors. *Id.* These factors include: (1) the examining relationship – more weight is given to the opinion of a source that has examined a plaintiff as compared to a source that has not; (2) the length, nature and extent of the treatment relationship – more weight is given to the opinion of treating sources since these professionals are most able to provide a detailed and longitudinal picture of a plaintiff's medical history; (3) the supportability of the opinion – more weight is given the opinions that are well explained and supported with clinical or diagnostic findings; (4) the consistency of the opinion – more weight is given to opinions that are more consistent with the record as a whole; (5) specialization – opinions of specialists are given more weight; and (6) other factors which tend to support or contradict an opinion. 20 C.F.R. §§ 404.1527(d), 416.927(d).

Regardless of the weight accorded, the ALJ's decision must always provide "good reasons" for the weight given to a treating source's opinion, *id.*, and an ALJ can only "reject a treating physician's opinion if it is based on 'contradictory medical evidence.'" *Dougherty v. Astrue*, 715 F. Supp. 2d 572, 581 (D. Del. 2010) (citing *Morales*, 225 F.3d at 317).

### a.  Dr. Reyes' Opinion

Plaintiff alleges that the ALJ erroneously rejected Dr. Reyes' opinion concerning Plaintiff's inability to work. (D.I. 10 at 12) However, Plaintiff's argument is without merit.

To the extent Plaintiff argues that he deserves benefits based upon Dr. Reyes' opinion that he is "unable to work," that argument fails "since those determinations are administrative decisions explicitly reserved for the [Commissioner]." *Conn*, 852 F. Supp. 2d at 526 (citing 20

C.F.R. § 404.1527(e)). *See also Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 n.2 (3d Cir.

2008) ("Conclusions of this kind are 'reserved to the Commissioner . . . because they are

administrative findings that are dispositive of a case; i.e., that would direct the determination or

decision of disability.'" (citing § 404.1527(e))). Thus, Dr. Reyes' opinion is "not controlling or

even considered [a] medical opinion[]." *Conn*, 852 F. Supp. 2d at 526.

To the extent Plaintiff argues that Dr. Reyes' opinion should have been given more

substantial weight, the court concludes that the ALJ properly weighed the evidence. Dr. Reyes'

opinion appears on a pre-printed "Disability Statement of Claim" form. (D.I. 5 at 278-79) The

only substantive information included in the form is Plaintiff's diagnosis of "[n]ear syncope," the

cause, "[p]ossible toxic exposure," and the date of such exposure. (*Id.*) Dr. Reyes wrote "N/A" in

response to every question addressing the end-date of Plaintiff's disability or the date on which

Plaintiff would be able to return to work. (*Id.*) The ALJ assigned little weight to this evidence

because "[n]othing in the medical record as a whole indicates that Dr. Reyes intended to

permanently limit [Plaintiff] from all work activities."[12] (*Id.* at 22)

The Third Circuit has explained that form reports which require physicians only to check

boxes or fill in a blank are considered "weak evidence at best," especially when such reports are

not accompanied by written explanations. *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)

---

[12] In response to this finding, Plaintiff contends that the ALJ should have re-contacted Dr. Reyes "[i]f [he] was unclear on the longevity of Dr. Reyes' opinion." (D.I. 10 at 17) Contrary to Plaintiff's argument, the ALJ is not required to re-contact a physician about ambiguous medical evidence where the entire record is adequate to determine whether the claimant is disabled. *See, e.g., Kelly*, 2013 WL 5273814, at *15 (explaining that the ALJ need not re-contact the medical source simply "because the ALJ finds the doctor's opinion inconsistent with the claimant's medical records" (citations omitted)); *Simmons v. Barnhart*, 2004 WL 2323776, at *6 (D. Del. Oct. 12, 2004) (same), *aff'd*, 148 F. App'x 134 (3d Cir. 2005). *See also* 20 C.F.R. 404.1520b(b) ("If any of the evidence in your case record, including any medical opinion(s), is inconsistent, we will weigh the relevant evidence and see whether we can determine whether you are disabled based on the evidence we have."); 20 C.F.R. 404.1520b ("We consider evidence to be inconsistent when it . . . is ambiguous . . . .").

(citations omitted). "Similarly, pre-printed opinions that do not offer specific limitations, written explanations, or support for assertions may also be considered weak evidence." *Clark v. Astrue*, 2010 WL 3909161, at *9 (D. Del. June 30, 2010) (citing *Singleton v. Astrue*, 542 F. Supp. 2d 367, 379-80 (D. Del. 2008)). Therefore, the ALJ properly exercised his discretion to limit the weight assigned to Dr. Reyes' opinion. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d).

### b. Dr. Romirowsky's Opinions

Plaintiff argues that the ALJ had "no legitimate medical basis" for rejecting Dr. Romirowsky's opinions. (D.I. 10 at 17) The court disagrees, and finds that substantial evidence supports the ALJ's weighing of Dr. Romirowsky's medical opinions.

As the Defendant suggests, there is a valid argument that Dr. Romirowsky should not be considered a "treating" medical source in this case. (*See* D.I. 15 at 15) Under the regulations, a treating source is one who has an ongoing treatment relationship with a patient. 20 C.F.R. §§ 404.1502, 416.902. Here, Plaintiff's ongoing treatment relationship with Dr. Romirowsky began four months prior to the hearing date. (*See* D.I. 5 at 792) During this period, Plaintiff had only five treatment sessions with Dr. Romirowsky.[13] (*See id.* at 789-94, 799-806) "Medical opinions based on treatment relationships occurring on a relatively infrequent basis may not warrant controlling weight in determining a case." *See Smith-Levering v. Barnhart*, 2004 WL 2211963, at *5 (D. Del. Sept. 27, 2004)

Nevertheless, even if Dr. Romirowsky is considered a treating source, Plaintiff's argument fails because the record shows that the ALJ properly weighed the medical opinions and provided good reasons for doing so. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ

---

[13] Although Plaintiff testified that he has seen Dr. Romirowsky eight to ten times since the summer of 2009 (D.I. 5 at 53), the record includes notes from only five treatment sessions. (*See id.* at 313-17, 789-94, 799-806)

assigned little weight to Dr. Romirowsky's opinions. Initially, the ALJ observed that "Plaintiff has not participated in ongoing therapy with Dr. Romirowsky for any significant period." (D.I. 5 at 22) The ALJ noted that none of the treating professionals, including Dr. Romirowsky, have "been provided with a significant enough time period to make progress with [Plaintiff's] somatoform disorder." (*Id.* at 19)

Furthermore, the ALJ found that the record as a whole demonstrates that Plaintiff's symptoms have been improving despite the absence of consistent mental health treatment. (*Id.* at 19) Drs. Sommers, Eliasson, Reyes, Kim, and Kaye noted various improvements in Plaintiff's condition. (*See id.* at 274, 287, 336, 329, 341, 383) Similarly, Plaintiff testified that his symptoms have been "progressively improving." (*Id.* at 46) Plaintiff's activities of daily living further bolster this notion of improvement. (*See id.* at 51, 56-58, 60, 193-200) Consequently, the evidence does not support Dr. Romirowsky's opinion that Plaintiff is refractory to psychological treatment. Moreover, the ALJ determined that Dr. Kaye's opinions, which contradict the opinions of Dr. Romirowsky, were more persuasive. (*Id.* at 22) Unlike Dr. Kaye, Dr. Romirowsky failed to substantiate his opinions with objective findings, and Dr. Kaye's opinions were more consistent with the medical record as a whole. (*See id.* at 329-32)

It should also be noted that Dr. Romirowsky provided inconsistent opinions concerning Plaintiff's mental RFC. Although the ALJ did not explicitly point out the inconsistency, his written decision makes it apparent. The ALJ explained:

> Samuel Romirowsky, Ph.D., completed a Mental Impairment Questionnaire on November 16, 2009. Dr. Romirowsky diagnosed the claimant with somatoform disorder . . . . Dr. Romirowsky concluded that the claimant . . . was limited, seriously limited or had a poor ability to perform all of the remaining mental functional abilities associated with work. The claimant was *mildly limited in his activities of daily living, moderately limited in his social functioning and markedly limited in his concentration.* . . .
>
> . . . .

29

> On November 19, 2009, Dr. Romirowsky concluded that the claimant was *markedly limited in his activities of daily living, his social functioning and in his concentration, persistence and pace* due to his somatoform disorder.

(D.I. 5 at 21 (emphasis added); *see also id.* at 803, 812) There is nothing in the record or Plaintiff's submissions that resolves the inconsistencies in Dr. Romirowsky's opinions.

In sum, the ALJ properly weighed Dr. Romirowsky's medical opinions and provided good reasons for doing so. "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph will probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981). Moreover, it is not for this court to reweigh the various medical opinions in the record. *See Monsour Med. Ctr.*, 806 F.2d at 1190. The court's review is limited to determining if there is substantial evidence to support the ALJ's weighing of those opinions. *Id.* Here, the ALJ's weighing of Dr. Romirowsky's opinions is supported by the record, and the ALJ properly exercised his discretion to limit the weight assigned to Dr. Romirowsky's opinions.

### c. Dr. Bleecker's Opinions

Substantial evidence supports the ALJ's weighing of Dr. Bleecker's medical opinions. As a preliminary matter, it is necessary to address Plaintiff's erroneous assertion that Dr. Bleecker is a treating source. (D.I. 10 at 13-17; D.I. 16 at 5-6)

A medical source may be considered a treating source where the claimant sees the source "with a frequency consistent with accepted medical practice for the type of treatment . . . required for [the claimant's] condition(s)." A medical source is not a treating source if the treatment is based "solely on [the claimant's] need to obtain a report in support of [his or her] claim for disability," and not based on medical need for treatment.

*Clark*, 2010 WL 3909161, at *7 (quoting 20 C.F.R. §§ 404.1502, 416.902)). In the present case, Dr. Bleecker examined Plaintiff only once, on January 31, 2008, at the direction of Plaintiff's attorney and in connection with prior workers' compensation litigation. (*See* D.I. 5 at 594)

Therefore, Dr. Bleecker is not a treating source and the ALJ was not required to give special deference to her medical opinions.

The ALJ assigned little weight to Dr. Bleecker's opinions because the medical record as a whole did not support Dr. Bleecker's conclusion that Plaintiff is unable to work. (D.I. 5 at 23) The ALJ observed that Dr. Bleecker did not provide objective findings to substantiate her opinion concerning the cause of Plaintiff's symptoms. (*Id.* at 401) Thus, it appeared that Dr. Bleecker "relied upon [Plaintiff's] subjective complaints to guide completion of her opinion." (*Id.* at 22, 401) Additionally, even though Dr. Bleecker performed only neurological testing on Plaintiff, she supplemented her diagnosis with the opinions of Dr. Malone (who performed neuropsychological testing) in concluding that Plaintiff is unable to work.[14] (*Id.* at 22, 401, 602) Notably, Dr. Malone did not provide an opinion about Plaintiff's ability to work. (*See id.* at 404-10) Consequently, the ALJ properly exercised his discretion to limit the weight assigned to Dr. Bleecker's opinions, and provided good reasons for doing so.

### d.  Dr. Eliasson's Opinions

The ALJ properly considered Dr. Eliasson's medical opinions and provided good reasons for assigning his opinions little weight. The ALJ assigned little weight to Dr. Eliasson's mental RFC assessment[15] because "[t]here [was] no indication in the medical record as a whole, despite Dr. Eliasson's testimony in his deposition to the contrary (*see id.* at 705-09), that he ha[d] any

---

[14] As discussed previously, in the context of Dr. Reyes' opinion, conclusions of this kind are administrative determinations that are explicitly reserved for the Commissioner. *See Johnson*, 529 F.3d at 203 n.2.

[15] Dr. Eliasson completed the mental RFC assessment in June 2009. (D.I. 5 at 786-88) Dr. Eliasson also completed a physical RFC assessment, but the report is undated. (*Id.* at 805-11)

professional medical training in psychiatry or psychology."[16] (*Id.* at 23). The absence of Dr. Eliasson's specialized training suggested that Dr. Eliasson relied heavily on Plaintiff's subjective complaints in completing the mental RFC assessment. (*Id.*) Importantly, this undermines the reliability of the RFC assessment. The ALJ previously determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not fully credible in light of evidentiary deficiencies and inconsistencies. (*See id.* at 20; *id.* at 46, 274, 287, 329, 341, 383 (noting improvements in Plaintiff's condition); *id.* at 51, 56-58, 60, 148-61, 390 (describing Plaintiff's various activities of daily living); *id.* at 320-22, 408-10 (demonstrating through objective testing average or above average intellectual and memory functioning))

The ALJ assigned little weight to Dr. Eliasson's remaining opinions, in part, because Dr. Eliasson diagnosed Plaintiff with asbestosis and bilateral interstitial fibrosis (*see id.* at 287, 574, 694), despite imaging studies to the contrary (*see id.* at 272, 287-95, 358-63). (*Id.* at 23) The ALJ observed that "[o]nly when testifying under oath[] did Dr. Eliasson reveal" that Plaintiff's test results were normal. (*Id.* at 23, 694, 733-36, 750) The ALJ noted that Dr. Eliasson's inconsistent diagnoses, in addition to his questionable RFC assessment, "erode confidence" in Dr. Eliasson's opinions. (*Id.* at 23) Moreover, the ALJ determined that the medical record as a whole does not support Dr. Eliasson's conclusion that Plaintiff is unable to work. (*Id.* at 23) As discussed previously, this finding is supported by substantial evidence. *See* Sections IV(B)(3)(b) & (B)(1), *supra*. Consequently, the ALJ properly weighed Dr. Eliasson's opinions and provided good reasons for doing so.

---

[16] Dr. Eliasson testified as an expert in internal medicine, pulmonary medicine, occupational medicine, and general medicine. (D.I. 5 at 687) He is board certified in internal medicine, pulmonary medicine, and critical care. (*Id.* at 284)

### 4. Whether Plaintiff's Mental Impairments Meet the Requirements of Listing 12.07 in 20 C.F.R. Pt. 404, Subpt. P, App. 1

Plaintiff challenges the ALJ's conclusion that Plaintiff's mental impairments do not meet the requirements of somatoform disorder in listing 12.07.[17] (D.I 10 at 18) According to Plaintiff, the ALJ's determination is erroneous because "Dr. Romirowsky specifically opined that [Plaintiff's limitations] met Listing 12.07." (D.I. 10 at 18)

Plaintiff's argument is without merit. Similar to findings of disability, determinations of whether impairments meet or equal the requirements in the Listings are administrative decisions reserved explicitly for the Commissioner. *See* 20 C.F.R. § 404.1527(2); *Johnson*, 529 F.3d at 203 n.2; *Conn*, 852 F. Supp. 2d at 526. Thus, Dr. Romirowsky's opinion is "not controlling or even considered [a] medical opinion[]." *Conn*, 852 F. Supp. 2d at 526.

To the extent Plaintiff argues that the ALJ's analysis at step three overlooked Dr. Romirowsky's opinion (*see* D.I. 15 at 18-19; D.I. 16 at 6-7), that argument similarly fails. The fact that the ALJ fails to discuss certain medical evidence in a particular section of his written decision does not necessarily render the decision erroneous. *See Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (explaining that the ALJ is "not require[d] . . . to use 'magic language' or adhere to a particular analytical format"). *See also Rivera v. Comm'r of Soc. Sec.*, 164 F. App'x 260, 263 (3d Cir. 2006) (holding that "the ALJ's conclusory statement in step three was harmless" in light of the "abundant [medical] evidence supporting the position taken by the ALJ"). Here, the ALJ discussed all of the relevant medical evidence, including Dr. Romirowsky's opinion, before concluding that Plaintiff was not entitled to disability insurance benefits. Furthermore, the court's "primary concern has always been the ability to conduct

---

[17] Listing 12.07 provides, in pertinent part: "Somatoform Disorders: Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms. The required level of severity for somatoform disorder under Listing 12.07 is met when the criteria in both A and B are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07.

meaningful judicial review." *Albury*, 116 F. App'x at 330. "Because the ALJ's decision in this case allows for such review, any error was harmless because the decision is still supported by substantial evidence, and the ALJ's decision is explained in sufficient detail to allow meaningful review." *Id.*

### 5. Award of Benefits

Plaintiff requests that the court award him disability benefits instead of remanding this case to the ALJ. (D.I. 10 at 19-20) As discussed previously, however, the ALJ's decision is supported by substantial evidence. Consequently, Plaintiff's request should be denied.

## V. CONCLUSION

For the foregoing reasons, I recommend that the court deny Plaintiff's motion for summary judgment and grant the Commissioner's cross-motion for summary judgment.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: February 27 , 2014

Sherry R. Fallon
United States Magistrate Judge